Filed 3/8/13  Employers Ins. Co. of Wausau v. Rick Concrete Construction CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EMPLOYERS INSURANCE COMPANY OF WAUSAU, | D058134 |
| Plaintiff, Cross-defendant and Appellant, | (Super. Ct. No. 37-2007-00071934-CU-IC-CTL) |
| v. | |
| RICK CONCRETE CONSTRUCTION, INC., | |
| Defendant, Cross-complainant and Appellant; | |
| PUTZMEISTER AMERICA, INC., Defendant and Respondent, | |
| LEXINGTON INSURANCE COMPANY, Intervener and Respondent. | |

APPEALS from a judgment and orders of the Superior Court of San Diego

County, John S. Meyer, Judge.  Affirmed in part, reversed in part.

INTRODUCTION

Rick Concrete Construction, Inc. (Rick Concrete) appeals, and Employers Insurance Company of Wausau (Wausau) cross-appeals, from a judgment of the trial court resolving a dispute between the parties regarding Wausau's handling of third party liability and first party physical damage claims under a business auto policy issued by Wausau. The parties' dispute arose from a February 2006 fatal accident at a construction site in Murrieta, California, involving concrete pumping equipment leased by Rick Concrete.

The trial of this action occurred in two phases. The first phase, tried to the court in July 2008, involved Wausau's claims for declaratory relief regarding preliminary coverage issues, including whether the equipment involved in the accident was a covered "auto" under Wausau's policy, and whether the "operations" exclusion of the policy applied. The second phase, tried to a jury in March 2010, involved Rick Concrete's cross-claims for damages based on, among other allegations, Wausau's alleged breach of contract, bad faith and fraud in the handling of Rick Concrete's insurance claims.

As reflected in the July 1, 2010 judgment, the trial court determined in the declaratory relief action that the equipment involved in the accident was a covered "auto," and the policy's "operations" exclusion did not apply. During the second phase of the trial, the court further ruled that Wausau brought the declaratory relief action reasonably and with proper cause. That ruling, and the trial court's order directing a verdict on Rick Concrete's fraud and misrepresentation claims, narrowed the cross-claims

2

to those alleging Wausau's breach of contract and bad faith in making untimely payments on Rick Concrete's first party physical damage claim. In its special verdict issued after trial of the second phase of the case, the jury found that Wausau breached its contract with Rick Concrete by failing to properly pay the first party physical damage claims. The jury also found that Wausau unreasonably delayed the first of its two payments to Rick Concrete for the cost of repairs to the equipment damaged in the accident. However, the jury found that Wausau did not unreasonably delay the second payment for damage to the equipment—a payment Wausau made only after the trial court determined that Wausau was liable not just for Rick Concrete's actual costs of repair, but for its reasonable costs of repair.

Rick Concrete appeals various evidentiary rulings made during the trial of its claims, as well as the trial court's grant of a directed verdict on its fraud and misrepresentation claims. Rick Concrete also challenges the use of the special verdict form that divided the jury's bad faith findings between the separate first party payments, as well as the jury's finding regarding the second payment, asserting the latter is unsupported by substantial evidence. Additionally, Rick Concrete contends the trial court abused its discretion in awarding it only $195 in attorney's fees, as allowed under *Brandt v. Superior Court* (1985) 37 Cal.3d 813 (*Brandt* fees). Finally, Rick Concrete asserts the trial court erred in denying prejudgment interest applicable to Wausau's belated second payment on the first party physical damage claim.

Wausau, in its cross-appeal, challenges the trial court's finding that coverage existed under Wausau's business auto policy for what Wausau contends was a construction accident covered instead by a general liability policy issued to Rick Concrete by another insurer. Wausau also argues the trial court erred in denying its request for reimbursement of expert fees pursuant to Code of Civil Procedure section 998, subdivision (c)(1).

For the reasons detailed below, we conclude the trial court erred in denying Rick Concrete's request for prejudgment interest. In view of that decision, the trial court's order taxing costs is vacated and this matter is remanded for further proceedings consistent with this opinion. In all other respects, we affirm the trial court's judgment and posttrial orders.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Wrongful Death Suit and Wausau's Declaratory Relief Action*

On March 13, 2007, a complaint for damages was filed against Rick Concrete and others entitled *Guillen, et al. v. Rick Concrete Construction, et al.* (Super. Ct. Riverside County, No. RIC467446) (the *Guillen* action). The *Guillen* action arose from an accident that occurred in February 2006. As alleged in the *Guillen* complaint, Rick Concrete leased a concrete pumper truck manufactured by defendant Putzmeister America, Inc. (Putzmeister), and brought it to a construction site in Murrieta, California, where the vehicle was then parked with three of its outrigger stabilizers deployed on pavement and the fourth on compacted soil. Jairo Heredia Guillen worked with the concrete after it was

4

pumped out of the concrete truck's boom onto the foundation that was under construction. The pumping of concrete had progressed without incident for some time. At one point, when the boom was being extended to reach a different part of the foundation, the ground underneath the fourth outrigger suddenly gave way, causing the boom to fall on Guillen, who died from his injuries.

Rick Concrete promptly tendered defense of the lawsuit to its business auto insurance carrier, Wausau. Wausau questioned coverage based on its view that the accident involved construction risks and not transportation risks. Nevertheless, it agreed to defend Rick Concrete under a reservation of rights, and advised that it would file a declaratory relief action to establish the nonexistence of coverage. Similarly, Wausau agreed to defend Putzmeister under a reservation of rights.

Wausau commenced its declaratory relief action in July 2007, seeking a judicial declaration that it did not owe a duty to defend Rick Concrete or Putzmeister in the *Guillen* action because (1) the Putzmeister vehicle was not a covered "auto" under the policy; and (2) the accident occurred during the operation of the concrete pumping boom, bringing it within one of the policy's exclusions of coverage. Lexington Insurance Company (Lexington), Rick Concrete's commercial general liability (CGL) insurer, intervened in Wausau's action. Lexington had denied coverage under its policy, contending that the vehicle involved in the accident was an "auto" excluded from coverage under the CGL policy.

After a two-day bench trial held in mid-July 2008, the trial court issued a statement of decision in which it determined that (1) the concrete pumper truck was a covered "auto" under Wausau's insurance policy, and (2) the "operations" exclusion of the policy did not apply. The court found that the truck was not pumping concrete at the time the accident occurred, but the boom was being relocated to reach a different part of the foundation. Thus, the accident did not arise from concrete pumping operations, but rather, "arose out of parking the unit," and "the shifting of the center of gravity" when the boom changed position.

B. *Rick Concrete's First Party Physical Damage Claim*

In October 2007, Rick Concrete filed a cross-complaint in the declaratory relief action against, among others, Wausau and Lexington. The complaint alleged, inter alia, breach of contract, breach of the covenant of good faith and fair dealing, and unfair business practices, arising from cross-defendants' alleged failure to properly investigate Rick Concrete's claims under their respective policies, to defend and indemnify Rick Concrete in the *Guillen* action, and to timely provide it benefits for physical damage to the concrete pumping equipment. In April 2008, Rick Concrete's cross-complaint was severed from Wausau's declaratory relief action and stayed until resolution of Wausau's claims. That stay was lifted on July 30, 2008, after the order on Wausau's request for declaratory relief was issued. In July 2009, Rick Concrete filed its third amended cross-complaint, from which Lexington had been dropped as a defendant. Rick Concrete added claims for fraud and misrepresentation, and focused more specifically on its allegations

6

that Wausau had failed to properly investigate the coverage issue and to timely provide Rick Concrete with first party benefits for physical damage.

The first party claims arose from Rick Concrete's efforts to repair the concrete pumper truck, which was damaged during the accident. A dispute arose between the parties regarding the benefits to which Rick Concrete was entitled on this claim. Rick Concrete argued that Wausau was aware of the physical damage claim shortly after the accident but improperly delayed investigating that claim. Wausau argued that Rick Concrete had delayed sending documentation relevant to its physical damage claims for over two years, and when that information finally was received, it raised a number of issues regarding Rick Concrete's claim. Wausau asserted that it attempted to investigate these issues, but Rick Concrete again delayed in providing needed information. In April 2009, Wausau paid Rick Concrete $55,297.42 for physical damage. Rick Concrete asserted that it was still owed interest on that payment, as well as additional sums for labor costs and consequential damages related to the first party physical damage claim, such as attorney's fees and other costs.

In May 2009, Wausau moved for an appraisal of Rick Concrete's first party physical damage claim, as authorized by the business auto policy. Over Rick Concrete's objection that this relief was neither warranted nor appropriate, the trial court granted Wausau's motion, ordered the appraisal, and continued the trial on Rick Concrete's cross-complaint (which had been scheduled to start that same month).

The appraisers issued their findings on September 22, 2009. The appraisers concluded, first, that "the actual total cost incurred by [Rick Concrete] to repair the damage to the Putzmeister equipment (including all labor, materials and other expenses) and restore the equipment to its pre-loss condition amounted to: $52,719.42." Second, the appraisers found that if Rick Concrete had hired outside companies to do the repair and restoration work, "it would have reasonably cost [Rick Concrete]: $79,716.42." Rick Concrete promptly demanded that Wausau pay the difference between the amount it already paid ($55,297.42) and the larger sum stated in the appraiser's findings—a difference of $24,419.00—arguing that the policy required Wausau to pay the reasonable costs of repair, and not simply the actual costs of repair. Wausau refused.

C. *The Trial and the Court's Rulings Limiting Rick Concrete's Claims*

On March 15, 2010, the first day of the rescheduled trial on Rick Concrete's cross-complaint, Wausau moved in limine motion for an order excluding any evidence of the additional first party physical damage benefits Rick Concrete claimed to be owed (a sum totaling $23,419.00, after the $1,000 deduction under the policy). The trial court denied Wausau's motion at that time, but agreed to take the matter up again later. Wausau renewed its motion before opening statements, arguing that this was a matter of policy interpretation the court was obliged to resolve before trial. The trial court ruled that Rick Concrete was entitled to the reasonable costs of repair, not just its actual repair costs.

8

Therefore, Wausau owed Rick Concrete the additional sum of $23,419.00 (reflecting the $1,000 deductible). Wausau issued a check for that amount to Rick Concrete the next day.

Wausau also moved in limine for an order determining that the filing of the declaratory relief action was reasonable and justified. The trial court deferred ruling on that issue.

Rick Concrete proceeded to trial on three main claims arising from its cross-complaint: (1) Wausau acted in bad faith by failing to conduct a reasonable investigation of Rick Concrete's claim for benefits under the policy, and by bringing the declaratory relief action without proper cause; (2) Wausau committed fraud in representing to Rick Concrete that it was continuing its investigation, when in fact it was not; and (3) Wausau wrongly delayed paying Rick Concrete benefits for its first party physical damage claim.

During the trial, Rick Concrete's president, Robert Matthews, was questioned about the damages Rick Concrete incurred as a result of Wausau's alleged wrongdoing. The first set of questions pertained to damages resulting from Wausau's alleged fraudulent conduct, and specifically, to Rick Concrete's contention that it a) would have downsized the company earlier but for Wausau's reassurances that it was continuing to investigate the company's first party physical damage claim, and b) that it had to mortgage certain property to help its cash flow. Wausau objected to the latter questions as irrelevant, which objections the trial court sustained. Wausau also objected to the questions relating to Rick Concrete's efforts to downsize. The trial court initially

9

overruled these objections and allowed Rick Concrete's counsel to attempt to lay an evidentiary foundation for this testimony. When Matthews was asked how much it incurred in costs related to delayed downsizing, Wausau objected again on the grounds of relevance and lack of foundation, and this time, the trial court sustained Wausau's objections. At side bar, Rick Concrete's counsel made an offer of proof regarding the types and amounts of damage allegedly suffered as a result of the alleged fraud. The court disallowed the testimony because no foundation had been laid connecting Wausau's alleged misrepresentations to those specific damages. The trial court also expressed some concern as to whether the damages information had been disclosed during discovery. As the court commented, "I think this is out of the blue and such a stretch, it really is."

The next day, on redirect examination, Matthews was again questioned regarding damages. Specifically, he was asked to describe Rick Concrete's damages resulting from Wausau's bad faith in unreasonably delaying payment on the policy, including the allegation that Rick Concrete was forced to borrow money and sell equipment to raise cash. Wausau objected based on the court's exclusion of evidence during the prior day's proceedings, and the court sustained those objections. Outside the presence of the jury, Rick Concrete's counsel argued that the types of damages suffered by the company had been disclosed during discovery, but the trial court reiterated its prior conclusion that no foundation had been laid connecting those damages to Wausau's alleged wrongdoing.

Near the close of testimony, the trial court again took up the question whether Wausau was justified in commencing the declaratory relief action. Concluding that the facts were undisputed and that this therefore was a question of law for the court to decide, the trial court determined that Wausau had good cause for bringing the declaratory relief action, and that doing so was reasonable. After both sides rested, Wausau moved for a directed verdict (1) on the claim that Wausau had wrongfully commenced the declaratory relief action; and (2) on all the fraud and misrepresentation causes of action. The court directed a verdict against Rick Concrete on the first claim because it already had ruled that Wausau had just cause for bringing that action. The court also directed a verdict against Rick Concrete on the fraud and misrepresentation claims.

### D. *The Jury's Verdict and Postverdict Proceedings*

At the conclusion of the trial, both parties proposed a special verdict form for the jury to use. The distinguishing feature of Wausau's form, for purposes of this appeal, was the manner in which it addressed Wausau's liability regarding the first party physical damage claim. Wausau's form first asked generally whether Wausau "delayed payment to Rick Concrete for repairs to the Putzmeister unit," and then asked generally whether that delay was "unreasonable or without proper cause." Assuming the answers to those questions were "yes," the form then posed separate questions addressing Wausau's liability as to each of the two first party payments—one asking whether Wausau had unreasonably delayed payment of the initial $55,297.42 payment, and a second asking the

11

same question as to the $23,419 payment. Over Rick Concrete's objection, the trial court adopted Wausau's proposed special verdict form.

On March 26, 2010, the jury returned a verdict in Rick Concrete's favor. It found that Wausau breached its insurance contract with Rick Concrete, and also found that Wausau breached the covenant of good faith and fair dealing by unreasonably or without good cause delaying payment on Rick Concrete's first party physical damage claim. On the specific questions regarding the two first party payments made by Wausau, the jury found that Wausau unreasonably delayed the payment for $55,297.42, but not the payment for $23,419.

The jury did not award damages because the trial court and the parties earlier had agreed that the only damages at issue after the court's rulings during the trial were *Brandt* fees and prejudgment interest, both of which were to be determined by the court. At the damages hearing held after the verdict, the key disputed issue was the amount of *Brandt* fees to be awarded as a result of the jury's bad faith verdict. Rick Concrete requested $186,915 in fees, which took into account the time its counsel had spent attempting to prove coverage under the policy during the declaratory relief action. Wausau, on the other hand, argued that Rick Concrete was not entitled to recover those fees because the trial court already had ruled Wausau was justified in seeking declaratory relief. The trial court, agreeing with Wausau, awarded Rick Concrete only $195.00 in *Brandt* fees. It also denied Rick Concrete prejudgment interest on the delayed payments of the first party

12

physical damage claim, finding that the amount owed under the policy was not a liquidated sum, as required by Civil Code section 3287, subdivision (a).

The trial court entered judgment on July 1, 2010. Both Rick Concrete and Wausau sought costs—the latter's request based on the fact that the value of the judgment in Rick Concrete's favor exceeded an offer of compromise made by Wausau pursuant to Code of Civil Procedure section 998 before the originally scheduled trial date. The trial court awarded costs to both parties, which resulted in an award of net costs to Rick Concrete in the amount of $15,855.47. The court denied Wausau's request for reimbursement of its expert witness fees pursuant to Code of Civil Procedure 998, subdivision (c)(1), on the ground that Wausau had not demonstrated the experts' work was reasonably necessary for the conduct of the litigation. Finally, the trial court denied Rick Concrete's motions for a new trial and for judgment notwithstanding the verdict.

## DISCUSSION

### I

### *RICK CONCRETE'S APPEAL*

A. *The Trial Court Properly Directed a Verdict on Rick Concrete's Fraud and Misrepresentation Claims*

In its appeal, Rick Concrete first contends the trial court abused its discretion in excluding evidence of damages Rick Concrete claimed to have suffered as a result of Wausau's alleged fraudulent conduct, and then, based on the lack of such evidence, erroneously directed a verdict in favor of Wausau on the fraud and misrepresentation claims. We need not decide the evidentiary issue because we conclude that, even if the

13

trial court had permitted Rick Concrete to present the excluded evidence, directing a verdict on the fraud and misrepresentation claims still would have been proper.

"[A] directed verdict is properly entered when ' "the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor." ' [Citation.]" (*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 174.) We review a directed verdict de novo. (*Ibid.*)

The essential elements of a fraud or misrepresentation claim include: (a) a misrepresentation; (b) knowledge of its falsity; (c) intent to defraud (i.e., intent to induce reliance); (d) justifiable reliance; and (e) resulting damage. (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 772, p. 1121 (Witkin); Civ. Code, § 1709.) Rick Concrete had the burden of establishing each of these elements by a preponderance of the evidence. (Witkin, *supra*, § 769 at p. 1118.) It fell far short of satisfying its burden.

Rick Concrete's fraud allegations arose from a September 4, 2007 letter written to Rick Concrete by Vicky Hanneman, Wausau's claims adjuster assigned to investigate the February 2006 accident. More specifically, Rick Concrete's claims focused on a small portion of that letter, where Hanneman stated:

> "[P]lease be advised that although Wausau is defending this case on your behalf under a reservation of rights, and has filed a Declaratory Relief Action regarding the coverage issues, I am not involved in that. My job continues to be, to investigate and resolve this case in a fair and equitable manner based on the evidence of the case, and in the best interests of Rick Concrete Construction."

Rick Concrete's president, Robert Matthews, testified these representations lured him into a false sense of security, and induced him to defer downsizing his company to

14

save money (including dropping insurance coverage of certain vehicles), in anticipation of what he thought would be a forthcoming resolution of the first party claim. This delay in downsizing is what Rick Concrete alleged caused its damages, and it would have been the subject of the excluded testimony.

Initially, we observe that the parties' briefing on this issue focused on the trial court's rationale for directing a verdict on the fraud and misrepresentation claims. Rick Concrete contends that the trial court rested its ruling solely on the absence of damages evidence, while Wausau contends the trial court perceived a broader failure of proof. Wausau is correct. The trial court engaged in an extensive colloquy with counsel regarding these claims, and initially was reluctant to grant a directed verdict. It ultimately concluded that discussion by noting that it had not allowed Rick Concrete's evidence on fraud damages and "it would be inconsistent to then allow the jury to speculate as to what those damages are. [¶] So I'm going to grant the directed verdict." Prior to that comment, however, the trial court had pointed out other gaps in Rick Concrete's proof of its allegations. For instance, the trial court opined that there was no evidence that the statements misrepresented anything, that Hanneman knew her statements were false, or that she had reason to know Rick Concrete would rely on her statements to its detriment.

Although Wausau, in its brief, argued that the directed verdict was appropriate for reasons other than the absence of evidence on damages, Rick Concrete made no effort to respond to those arguments in its reply brief. In any event, even if we assume the

15

principal basis for the court's ruling was its exclusion of evidence regarding damages, we may affirm on any applicable legal ground. (*People v. Geier* (2007) 41 Cal.4th 555, 582 ["[W]e review the ruling, not the court's reasoning . . . . ' " 'If right upon any theory of law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " ' "].)

During her trial testimony, Hanneman testified that she understood Matthews was concerned that the process of investigating Rick Concrete's claims was going slowly, and she attempted to explain to him the obstacles she was confronting in completing her investigation. She told him that "we would continue to investigate and . . . try to get the cases resolved." She testified that she believed her "promise" in her letter to continue to investigate was true, it was her intention to act in Rick Concrete's best interests, and that is in fact what she tried to do. She did not intend to mislead or deceive Rick Concrete by making those statements, but acknowledged that at the time she was more focused on the third party liability claim than on the first party physical damage claim. She also candidly acknowledged that she did "very little, if anything," to investigate the first party claim. The thrust of her testimony was that Wausau's investigation of the first party physical damage claim was neither swift nor thorough.

Apart from Matthews's and Hanneman's testimony, Rick Concrete identifies no other evidence directly pertinent to the claim that the September 2007 letter constituted a fraudulent misrepresentation on which Rick Concrete allegedly relied, and which allegedly induced Rick Concrete to defer taking money-saving steps. The foregoing

16

evidence, however, is insufficient to satisfy Rick Concrete's burden of proof as a matter of law.  First, we conclude that the statements in the September 2007 do not constitute misrepresentations.  The unchallenged testimony is that the letter accurately described Hanneman's responsibilities—i.e., it was, in fact, her job to continue the investigation and act in Rick Concrete's best interests.  Second, even if these statements could be construed as a "promise" to do anything, in our view they do not constitute a *false* promise, because Hanneman testified she fully intended to do her job.  Although she acknowledged that a thorough and timely investigation on the first party claim ultimately did not occur, that fact alone is insufficient to constitute fraud.  (See Witkin, *supra*, § 781 at pp. 1131-1132 [a promise made without any intention to perform it may constitute fraud, but a "declaration of intention . . . made in good faith, without intention to deceive, and in the honest expectation that it will be fulfilled, does not constitute fraud, even though it is not carried out"].)  Nothing in Hanneman's testimony or any other evidence presented at trial reasonably would have allowed the jury to conclude that Wausau never truly intended to investigate the first party claim, based merely on the fact that a proper investigation ultimately did not occur.

Third, there is no evidence of scienter, or knowledge of falsity. As noted, Hanneman testified she believed her statements to be true. She had no intention of inducing Matthews' reliance on those statements to his detriment.[1] Finally, taking as true Matthews's testimony that he in fact relied on these statements, there is no evidence indicating that Matthews was *justified* in doing so. The only "promise" Hanneman made was that she would continue the investigation and work to resolve the claims in a "fair and equitable manner." Matthews certainly was justified in relying on Hanneman doing exactly that, but she made no promises as to the ultimate outcome of her investigation. Matthews could not reasonably assume that the outcome necessarily would be that Rick Concrete would receive *all* the policy benefits it claimed, since Matthews knew the declaratory relief action had been filed at the time he received Hanneman's letter, and Wausau was contesting coverage. Accordingly, it would have been foolhardy to rely on Hanneman's mere confirmation that the investigation was continuing, as a reason to defer taking any cost-saving steps in the interim.[2]

---

[1] Rick Concrete also alleged a claim for negligent misrepresentation, which does not require actual knowledge of falsity. At a minimum, however, Rick Concrete was required to prove on that claim that Hanneman made her statements without any reasonable basis to believe they were true. (Witkin, *supra*, § 800 at p. 1157.) The evidence summarized above is inadequate to support even that inference.

[2] We also find compelling the fact that just one month after Hanneman's September 2007 letter, Rick Concrete filed its cross-complaint alleging Wausau's bad faith in failing to adequately investigate its first party claim. This fact undermines Rick Concrete's

18

In sum, even without considering whether the trial court was within its discretion to exclude evidence of fraud-related damages, the record shows that Rick Concrete failed to adduce sufficient evidence to meet its burden of proving the other elements of its fraud and misrepresentation claims. As the trial court remarked, "Admittedly, the first party claim fell through the cracks," and the jury concluded that Wausau breached its contract and unreasonably delayed the initial first party payment. There simply was insufficient evidence, however, to show that Wausau also intentionally or recklessly misrepresented to Rick Concrete that it was continuing to investigate its claims and act in its best interests, with the intention that Rick Concrete rely on those statements to its detriment. In these circumstances, the trial court did not err in directing a verdict on those claims.[3]

### B. *The Trial Court Did not Abuse its Discretion in Excluding Evidence of Alleged Bad Faith Damages*

Rick Concrete also challenges the exclusion of certain evidence it contends would have proved its damages resulting from Wausau's unreasonable delay in paying first party benefits. The proffered evidence concerned Rick Concrete's efforts to raise cash by selling equipment and borrowing money. The trial court excluded the evidence because

---

assertion that it relied on Hanneman's assurance that she would continue to investigate and act in Rick Concrete's best interests.

[3] Although we need not review the correctness of the trial court's exclusion of evidence regarding fraud damages, our analysis here indicates that ruling was within the trial court's discretion, as Rick Concrete had failed to lay a foundation showing the causal link between Hanneman's statements and the damages Rick Concrete sought to prove. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111 (*Gordon*) [trial court's evidentiary rulings are reviewed for abuse of discretion]; see Evid. Code, §§ 401-403 [concerning foundational evidence]; see also discussion *post*, at pt. III.B.)

19

Rick Concrete had not laid the necessary foundation. We review the trial court's exclusion of this evidence for abuse of discretion, and conclude there was none. (*Gordon*, *supra*, 170 Cal.App.4th at p. 1111; *Caira v. Offner* (2005) 126 Cal.App.4th 12, 32.)

Only relevant evidence is admissible. (Evid. Code, §§ 350, 351.) Evidence Code section 352 grants the trial court broad discretion to exclude even relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Avila* (2006) 38 Cal.4th 491, 578.) " 'The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value.' " (*People v. Jones* (2011) 51 Cal.4th 346, 373.) Additionally, the trial court may exclude evidence in its discretion if it concludes the proponent has laid an insufficient foundation for that evidence. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1102, 1103; see also Evid. Code, §§ 401-403.)

Rick Concrete's theory of damages resulting from Wausau's bad faith is somewhat unclear. Initially, it appeared that Rick Concrete contended it had lost business revenue as a result of the declaratory relief action, which required Matthews to take time off from work to assist his counsel with defending that action. Wausau objected to Matthews's proffered testimony on this matter because Rick Concrete had not previously disclosed the relevant facts in discovery. The court characterized this theory as "a stretch," and

20

stated he would not allow the testimony because there had been no foundation laid; that is, there had been no "showing prior to trial quantifying the hours spent and connecting those hours with loss of business."  Nevertheless, the following day, over Wausau's objection, the trial permitted Matthews to testify about how he had to take time away from work to assist counsel with the declaratory relief action.  But Matthews gave no details about specific revenues lost directly because of his missing work.  Instead, he merely testified as to what he would usually earn in a day of pumping concrete.  Matthews was also questioned at trial about having to sell equipment and borrow money as a result of Wausau's withholding of policy benefits.  The court did not allow that testimony.  Its reason for excluding this evidence was lack of foundation, as had been discussed the prior day.  The trial court made clear that its principal concern was that "there's just no connection between what Wausau did and all of these amorphous . . . damages."

Rick Concrete now asserts that the bad faith damage issues "had nothing to do with alleged loss business claims."  We assume by this statement that Rick Concrete is limiting its claimed damages solely to its efforts to sell equipment and borrow money to improve its cash flow when the first party benefits were not paid promptly.  If that is the case, however, Rick Concrete still has failed to demonstrate that it laid a proper foundation for Matthews's testimony on that subject.

At trial, Rick Concrete argued that the necessary foundation had been laid during discovery.  It submitted to the trial court as an offer of proof some of its discovery

21

responses and deposition testimony relating to bad faith damages. We agree with the trial court that this evidence was insufficient to lay the necessary foundation. For example, in response to interrogatories asking what bad faith damages it claimed, Rick Concrete stated its damages included "loss of cash flow, . . . was forced to sell equipment, [and] was forced to mortgage a property." Nothing in those answers specifically linked those claimed damages to Wausau's delay of the first party benefit payments.

Matthews's deposition testimony on this subject also shed no light on why he was required to raise these additional sums specifically because of the delay of policy benefits. He testified as to items sold, property mortgaged, and money borrowed from his mother; estimated the amounts involved; and stated that his reasons for raising these monies were to "pay for attorneys' fees" and "front some money for the geotechnical [experts]." What is absent again, however, is any testimony from which the jury could have determined that Wausau's delay of the first party benefits was the specific reason why Rick Concrete needed to raise these funds. Thus, nothing in this testimony shows that the geotechnical experts were needed for the bad faith trial, as opposed to the *Guillen* action. There was no explanation as to how the attorneys' fees related to counsel's efforts to obtain the first party benefits in particular, as opposed to other issues arising from the accident.[4] Matthews also testified that to some extent the money he raised from selling equipment was used "to keep the business afloat." But this would appear to relate only to

---

4    Wausau already was providing Rick Concrete with a defense in the *Guillen* action under a reservation of rights, and had agreed to pay fees for Rick Concrete's own counsel in that matter.

claimed lost income resulting from the declaratory relief action, which Rick Concrete now asserts is not part of its bad faith damages claim.

Given this dearth of foundational evidence showing any causal connection between Wausau's unreasonable delay in paying first party benefits and the alleged damages suffered, we cannot conclude the trial court abused its discretion in disallowing Matthews's testimony on this subject. At best, Matthews's testimony on bad faith damages would require the jury to speculate about any such causal connection. However, "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

### C. *The Trial Court Did not Err in Approving Use of a Special Verdict Form Asking the Jury to Separately Determine Wausau's Bad Faith as to Each First Party Payment*

Rick Concrete next contends that the trial court erred in approving Wausau's special verdict form that asked the jury to separately determine Wausau's bad faith liability as to each of its first party physical damage payments to Rick Concrete. The use of that form, Rick Concrete argues, resulted in a verdict that was illogical and inconsistent, when the jury found that Wausau unreasonably delayed the first payment of $55,297.42, but did not unreasonably delay the second payment of $23,419. "[A] special verdict's correctness is analyzed as a matter of law and therefore subject to de novo review." (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.)

The gist of Rick Concrete's argument is that there was no legal basis for departing from the recommended special verdict format (i.e., CACI No. 2331) by asking separate

23

questions regarding the payments, because if the initial payment from Wausau was unreasonably delayed, then, ipso facto, the second payment made over a year was also unreasonably delayed. Furthermore, Rick Concrete contends, Wausau had no basis for arguing to the jury that a genuine dispute existed as to its liability prior to the time it made the initial $55,297.42 payment, and thus, there was no basis on which the jury could have found Wausau was justified in delaying making any part of the *full* payment owed. These arguments are unpersuasive.

A verdict " 'should be interpreted so as to uphold it and to give it the effect intended by the jury, as well as one consistent with the law and the evidence.' " (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1223.) Verdicts "are deemed inconsistent when they are 'beyond possibility of reconciliation *under any possible application of the evidence and instructions*.' [Citations.] 'If any conclusions could be drawn thereunder which would explain the apparent conflict, the jury will be deemed to have drawn them.' [Citation.]" (*Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716; italics added.)

"Inconsistent verdicts are ' "against the law," ' and the proper remedy is a new trial." (*Shaw v. Hughes Aircraft Co*. (2000) 83 Cal.App.4th 1336, 1344 [concluding jury's finding there was no breach of contract was irreconcilable with finding that defendant breached covenant of good faith and fair dealing].) " 'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact *based on the same evidence*.' [Citations.]" (*City of*

*San Diego v. D.R. Horton San Diego Holding Co.* (2005) 126 Cal.App.4th 668, 682, italics added; see also *Stillwell v. The Salvation Army* (2008) 167 Cal.App.4th 360, 374 (*Stillwell*).)

The foregoing authorities implicitly recognize that inconsistency in special verdict determinations likely will not occur where separate determinations of fact are based on *different* evidence. That is the case here. Rick Concrete's principal theory at trial with respect to its first party physical damage claim was that Wausau had failed to thoroughly and timely investigate that claim. The first payment of $55,297.42 was made over three years after the accident occurred. In light of all the evidence, the jury reasonably could have concluded—and apparently did conclude—that this payment had been unreasonably delayed. The second payment, however, came about only after a dispute *subsequently* arose on an independent legal issue generated by the appraisal, namely, whether Wausau's liability was not for the actual costs of repair, but the reasonable costs of repair. The appraisal unusually resulted in two different amounts for which Wausau possibly could be liable, but did not determine which of the two was the appropriate sum. That issue was not settled until the trial court ruled, just before the bad faith trial commenced, that Rick Concrete was entitled as a matter of law to recover the higher sum reflecting the reasonable costs of repair. Wausau paid the balance owed the day after the trial court's decision. The jury reasonably could conclude—and again, apparently did—that under these facts, Wausau did not unreasonably delay in making the second payment.

The facts and circumstances surrounding the two separate payments therefore were quite different. Rick Concrete cites no authority for the proposition that the trial court may not use a special verdict form asking the jury to separately determine an insurer's bad faith liability arising from separate first party payments, when the evidence relevant to those respective payments is different. As noted previously, the applicable case law indicates that the procedure used by the trial court here was appropriately tailored to the evidence. (See *Stillwell*, *supra*, 167 Cal.App.4th at p. 374 [stating factfinder may not make independent determinations based on the *same* evidence]; see also *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424 [in disability discrimination lawsuit, there was no inconsistency in the verdicts on the reasonable accommodation and interactive process claims, where they involved "separate causes of action and proof of different facts"].)[5]

Rick Concrete insists, however, that because the jury found the first payment was unreasonably delayed, and the second payment was made over a year after the first payment was made, that jury *necessarily* was required to find that the second payment was also unreasonably delayed. This argument, however, disregards the factual differences we have just summarized underlying the two payments. It is not enough for

---

[5] We also reject any suggestion by Rick Concrete that the trial court was bound to use the model form of CACI No. 2331, regardless of the evidence in the case. The user's guide accompanying the recommended Civil Jury Instructions of the California Judicial Council explicitly cautions: "The verdict forms must be modified as required by the circumstances. It is necessary to determine whether any lesser or greater specificity is appropriate." (Judicial Council of California, Civil Jury Instructions (2011) p. xx.)

26

Rick Concrete to assert that Wausau's bad faith liability inexorably extends to the second payment merely because it was made later in time. Rather, Wausau's liability for the second payment depends on whether Wausau was justified in questioning its liability for the reasonable costs of repair, rather than just the actual costs of repair incurred by Rick Concrete, and in seeking an appraisal and judicial resolution of that issue. In other words, did a genuine dispute exist as to its liability for the additional sum Rick Concrete claimed to be owed under the policy? (See *McCoy v. Progressive West Ins. Co*. (2009) 171 Cal.App.4th 785, 793 (*McCoy*) [" 'Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute.' "]; *Rappaport-Scott v. Interinsurance Exchange of the Automobile Club* (2007) 146 Cal.App.4th 831, 837 ["In a first party case . . . the withholding of benefits due under the policy is not unreasonable if there was a genuine dispute between the insurer and the insured as to coverage or *the amount of payment due*." (Italics added.)].)

Rick Concrete posits two reasons why no such genuine dispute existed. First, it suggests that for the "genuine dispute" doctrine to apply, any such dispute had to have arisen prior to the *first* payment made. Rick Concrete fails to explain why this must be so. It is entirely tenable, in our view, that the jury would find a genuine dispute existed as to the second payment, but did not exist as to the first, because the contested issues were different as to each payment. As explained earlier, although the evidence regarding the first party payments focused generally on the question whether Wausau failed to fully

27

and timely investigate the first party physical damage claim, the evidence as to the second payment focused more specifically on the legal dispute regarding the extent of Wausau's liability, a dispute that crystallized only after the first payment was made and the appraisal results were issued.

Rick Concrete also contends that Wausau failed to raise any genuine dispute because it presented no expert testimony supporting its contention it was liable only for the actual costs of repair. *Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282, cited by Rick Concrete, does not create such an ironclad rule. In *Fraley*, this court observed that the "genuine dispute" doctrine "*may* be applied where the insurer denies a claim based on the opinion of experts." (*Id*. at p. 1292, italics added.) It does not hold that the doctrine may be invoked *only* based on such an opinion. We also note that in one of the cases we cited in *Fraley,* the court's holding that the disability insurer had acted reasonably, if incorrectly, in denying disability benefits, was not based on any expert's opinion. (See *Austero v. National Cas. Co.* (1978) 84 Cal.App.3d 1, 23, 33-36 [although court held disability benefits were properly awarded by jury, it found as a matter of law that insurer had not acted unreasonably in denying benefits based on evidence that insured had continued to work despite claimed disability]), disapproved on other grounds in *Egan v. Mutual of Omaha Ins. Co*. (1979) 24 Cal.3d 809, 824, fn. 7.)

In this case, Wausau presented undisputed evidence that after the appraisal award, which presented two different values for the costs of repair, Wausau obtained outside legal advice in an effort to determine which sum it ought to pay—advice on which it

relied in denying Rick Concrete's claim to the larger amount based on the reasonable costs of repair. The letter sent to Rick Concrete by Wausau's counsel set forth legal authority he argued supported denial of the higher amount the appraisers found would have been a reasonable cost had Rick Concrete used an outside vendor to repair the Putzmeister equipment. Rick Concrete cites to no evidence in the record suggesting that Wausau's reasons for not paying the larger amount immediately were merely pretextual. It is also undisputed that Wausau issued a second check to Rick Concrete one day after the trial judge determined Rick Concrete was entitled to the larger amount.

We conclude that the trial court's use of a special verdict form asking the jury to make separate determinations regarding each of the first party physical damage payments was warranted and appropriate given the different facts and circumstances underlying these payments.

D. *Substantial Evidence Supports the Jury's Verdict Finding Wausau Did Not Unreasonably Delay the $23,419 First Party Physical Damage Payment*

Rick Concrete also contends that there is no substantial evidence supporting the jury's determination that Wausau did not unreasonably delay the $23,419 payment. It challenges this part of the jury's verdict on the same grounds it challenged the special verdict form: (1) if the first payment was unreasonably delayed, the second, later payment necessarily was also unreasonably delayed, and (2) Wausau presented no expert opinion supporting the application of the "genuine dispute" doctrine. We have already identified the flaws in these arguments, and the same analysis applies here. The law is clear that an insurer cannot be liable in bad faith where its position in denying a claim is

29

reasonable and based on a genuine dispute.  (*Wilson v. 21st Century Insurance Co.* (2007) 42 Cal.4th 713, 723; *McCoy*, *supra*, 171 Cal.App.4th at p. 793.)  Rick Concrete does not identify any evidence that Wausau's reasons for not paying the additional $23,419 immediately upon Rick Concrete's demand were merely pretextual.  Accordingly, substantial evidence supports the jury's determination that Wausau's second payment, made after appraisal and a judicial determination that it was owed, was not in bad faith.[6]  (See *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873 [substantial evidence is evidence that is " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value,' " italics omitted].)

### E.  *The Trial Court's Award of $195 in Brandt Fees Conforms with Applicable Law*

After the verdict was issued, Rick Concrete sought $186,915 in *Brandt* fees.  This request included attorney fees Rick Concrete had incurred in defending the declaratory relief action.  Wausau argued that Rick Concrete could not obtain such fees when the trial court had already held the declaratory relief action was not brought in bad faith.   The trial court agreed, and awarded Rick Concrete just $195 in *Brandt* fees, attributable to the time spent by counsel exchanging correspondence with Wausau that ultimately led to the first payment of first party benefits.

---

6     In light of our conclusions here, we need not address Wausau's "protective" cross-appeal challenging the correctness of the finding that the $55,297.42 first party physical damage payment was unreasonably delayed.

30

We generally review the award of such fees for abuse of discretion. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 805 (*Cassim*).) A trial court abuses its discretion if it awards *Brandt* fees not supported by substantial evidence, or misconstrues applicable legal criteria. (*Ibid.*; see also *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 577 ["A request for an award of attorney fees is entrusted to the trial court's discretion and will not be overturned in the absence of a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence."].)

Since *Brandt*, it has been well settled that attorney's fees reasonably incurred to compel payment of policy benefits are recoverable as an item of damages in an insurance bad faith case. (*Cassim*, *supra*, 33 Cal.4th at p. 806; see *Brandt*, *supra*, 37 Cal.3d at p. 817.) However, the California Supreme Court has placed certain critical limitations on the recovery of *Brandt* fees, which is an exception to the "American rule" generally requiring each party to a litigation to pay its own attorney's fees. (*Cassim*, *supra*, at p. 806.) First, this exception is intended to be a limited one, and the insured may recover only those fees "attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract." (*Brandt*, *supra*, at p. 819.) Second, an essential premise for allowing recovery of such fees is that the insurer's bad faith "proximately caused damages" in the form of requiring the insured to hire counsel to obtain the rejected policy benefits. (*Cassim*, *supra*, at p. 806, citing *Brandt*, *supra*, at p. 817.) Third, although tortious (i.e., bad faith) conduct by the insurer is a prerequisite to an award of *Brandt*

31

fees, only those fees incurred to obtain benefits under the insurance contract—not fees incurred to prove the insurer's bad faith—are recoverable. (*Cassim*, *supra*, at pp. 806, 811.) Accordingly, if, as is often the case, the attorney's efforts to obtain contractual benefits and to prove bad faith overlap, "the trial court should exercise its discretion to apportion the fees." (*Id*. at p. 811.)

Wausau brought the declaratory relief action to determine coverage for purposes of the third party claim (i.e., the *Guillen* action). Although Rick Concrete's cross-claims encompassed both the *Guillen* action and the first party physical damage claim, its cross-claims were severed from the declaratory relief action. Once the trial court determined Wausau reasonably had brought the declaratory relief action, only the first party physical damage claim remained to be tried. The evidence at trial of Wausau's bad faith focused on Wausau's failure to timely and thoroughly investigate that claim. Rick Concrete proved Wausau's bad faith only as to the initial first party payment.

Rick Concrete argues that it could not segregate the fees it incurred in defending the declaratory relief action from those incurred by its counsel to obtain first party benefits under the policy, because these efforts were "inextricably intertwined."[7] In other

---

[7]    Generally, the "apportionment" that must occur under *Brandt* is between attorney's fees incurred in proving the tortious actions of the insured, and fees incurred to obtain the contractual benefits. (See, e.g., *Cassim*, *supra*, 33 Cal.4th at p. 811 [emphasizing that an insured may recover only for contractual, not tort, claims].) Rick Concrete, however, characterizes the relevant "apportionment" question as whether counsel's fees in defending the declaratory relief action on the *third party* liability claim must be segregated from the fees incurred in obtaining the *first party* physical damage claim. Because we resolve the *Brandt* fee issue on other grounds, it is unnecessary for us to address whether this is the relevant "apportionment" inquiry.

32

words, Rick Concrete argues, it could not obtain the first party benefits unless it first established during the declaratory relief action that the Putzmeister vehicle was a covered "auto." As a practical matter, it is true that determining whether the vehicle was a covered "auto" under the policy was essential to obtaining first party physical damage benefits, but that is not the dispositive inquiry under *Brandt*. In our view, the problem with Rick Concrete's position is not its failure to apportion fees between those that are recoverable under *Brandt* and those that are not. Rather, the problem is that Rick Concrete has not shown the fees it incurred in connection with the declaratory relief action were incurred because of Wausau's bad faith.

It is undisputed that only those fees incurred to obtain policy benefits Wausau unreasonably denied or delayed are recoverable. (*Brandt*, *supra*, 37 Cal.3d at p. 817 [recoverable fees are, in essence, damages "proximately caused" by insurer's failure to discharge its responsibilities under the insurance contract in good faith].) Critically, however, the trial court held that Wausau did not bring the declaratory relief action in bad faith, and Rick Concrete has not appealed that ruling. Because the trial court determined that Wausau had proper cause to prosecute the declaration relief action, the fees Rick Concrete incurred in defending that action were not "proximately caused" by any bad faith on Wausau's part, and thus are not recoverable. (*Ibid.*)

In light of that ruling, the only fees Rick Concrete may recover are those attributable to its counsel's efforts to obtain first party benefits, and in particular, the efforts associated with obtaining the initial $55,297.42 payment, because only in

connection with that payment did the jury find Wausau acted in bad faith.  It bears noting that Rick Concrete points to no evidence in the record establishing any causal link between Wausau's proven bad faith (with regard to one of the first party payments) and the fees Rick Concrete incurred in defense of the declaratory relief action brought to determine coverage for the third party liability claim.  As we have explained, it is not enough for Rick Concrete simply to argue that establishing coverage was a necessary prerequisite to obtaining first party benefits.  That is always the case.  The only situation in which the law allows recovery of *Brandt* fees is when hiring counsel to prove coverage and obtain benefits is the proximate result of the insurer's bad faith—a critical fact Rick Concrete was unable to prove as to attorney's fees incurred in connection with the declaratory relief action.  Accordingly, the trial court did not abuse its discretion in awarding Rick Concrete $195 in *Brandt* fees.[8]

F. *The Trial Court Erred in Denying Prejudgment Interest on the $23,419 Payment*

Finally, Rick Concrete contends the trial court improperly denied its request for prejudgment interest on the second first party payment, from the date the appraisal results were issued to the date of judgment. The trial court denied prejudgment interest because,

---

[8]    Rick Concrete does not dispute that $195 is the amount to which it is entitled if this Court affirms the trial court's *Brandt* fee ruling.

in its view, the $23,419 was not a liquidated sum, as required under Civil Code section 3287, subdivision (a).[9]

As we explained in *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948:

> " 'The test for recovery of prejudgment interest under [Civil Code] section 3287, subdivision (a) is whether *defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount.' . . . 'The statute [Civil Code section 3287] does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, "depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his debtor." ' [Citations] . . . Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate."

(*Id*. at p. 960; see also *Stein v. Southern Cal. Edison Co.* (1992) 7 Cal.App.4th 565, 573 (*Stein*) ["Where the amount of damages cannot be resolved except by account, verdict or judgment, interest prior to judgment is not allowable."].)

As these cases illustrate, the uncertainty that compels denial of prejudgment interest is uncertainty as to the *amount* of damages, not as to whether the damages are owed (i.e., liability). Thus, in *Olson v. Cory* (1983) 35 Cal.3d 390, the California Supreme Court reversed a denial of prejudgment interest on class members' salary and

---

[9]     Rick Concrete also sought prejudgment interest on the first payment, but has not pursued the court's denial of interest as to that payment on appeal.  We also note that in its opening brief, Rick Concrete argued that interest on the second payment should be calculated beginning with issuance of the appraisal report, but in its reply brief, it suggests interest on that payment began to accrue as early as April 2006.  Because Rick Concrete's reply argument appears to be essentially a cut-and-paste from its trial brief on damages, we will disregard this latter argument, which in any event is unsupported by law, as there was no liquidated sum in April 2006.

pension increases which had been awarded to them in a prior decision. Defendants claimed that these damages were not certain or capable of being made certain until the Supreme Court resolved in its earlier decision who was entitled to a payment and how much was owed. (*Id*. at p. 402.) The court disagreed. "[T]he certainty required of Civil Code section 3287, subdivision (a) is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability." (*Ibid*.) In *Olson*, the court held, the amount due to each member of the class was "either of two readily calculable amounts," depending on whether the original or amended version of the relevant statute was applicable. (*Ibid*.) "The question whether to pay any [class member] under one version of the statute or the other did not depend on any factual uncertainty or dispute but solely on the proper answers to the questions of law ultimately resolved [in the prior decision]. "Uncertainty over those legal issues did not prevent the amounts due from being 'certain or capable of being made certain by calculation.' " (*Ibid*.; see also *Stein*, *supra*, 7 Cal.App.4th at p. 572 ["Denial of liability on the main theory does not make the damage uncertain within the meaning of section 3287."].)

Similarly, in *Credit Managers' Ass'n of Southern California v. Brubaker* (1991) 233 Cal.App.3d 1587, plaintiff, who had been assigned the assets of an insolvent partnership, had sent defendant, the chief executive officer of the partnership, a letter demanding return of a specific sum representing transfers he had received allegedly in preference over other secured creditors. (*Id*. at p. 1590.) When payment was not made, plaintiff filed a complaint, and the jury ultimately awarded the exact amount plaintiff had

36

demanded from defendant. The trial court, however, denied prejudgment interest on that amount. (*Id*. at p. 1595.) The appellate court reversed, holding that defendant knew the exact amount due as a result of plaintiff's demand letter, and thus, plaintiff was entitled to interest from that date. (*Ibid*.) The fact that defendant had denied liability on plaintiff's main theory did not render the damages uncertain within the meaning of the statute. (*Ibid*.)

This case is analogous to both *Olson* and *Credit Managers*. As in *Olson*, Wausau knew, as of the date the appraisal results were issued, that it was liable for one of the two sums listed in the appraisal. Thereafter, Wausau *did not dispute those numbers or how they were calculated*. Rather, Wausau disputed whether it was legally obligated to pay the larger number (representing the reasonable costs of repair) rather than the smaller number (representing Rick Concrete's actual costs of repair). That was not a factual question, as Wausau now insists, but a purely legal one, as Wausau emphasized repeatedly to the trial court in its effort to convince the court that it, and not the jury, should decide the issue. Ultimately, the trial court ruled that Wausau was liable for the reasonable costs of repair. As in *Olson* and *Credit Managers*, the fact that Wausau disputed its liability for the additional $23,419 does not render the *amount* of damages uncertain.

It is also entirely beside the point that, as Wausau argues, the jury found Wausau did not act in bad faith with respect to the second payment. The jury found that Wausau breached its contract with Rick Concrete "by failing to properly pay for Rick Concrete's

37

equipment damage claim." That breach of contract alone entitles Rick Concrete to an award of prejudgment interest, because section 3287, subdivision (a) requires payment of such interest to "[e]very person who is entitled to recover damages certain, or capable of being made certain." (Civ. Code, § 3287, subd. (a); see Wegner et al, Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2011) ¶ 17.179, p. 17-141 (Wegner) [prejudgment interest commonly awarded on contract claims for liquidated amounts].) The interest runs from the date of the appraisal report (Sept. 22, 2009) to March 16, 2010, when Wausau paid the additional $23,419—for a total of $1,123.50 in prejudgment interest ($6.42 per day, over 175 days). (See *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828 [interest begins to accrue when there is both a breach and a liquidated amount]; Wegner, *supra*, ¶ 17.177, at p. 17-141, and ¶ 17.185, p. 17-145 [same].)[10]

---

[10] Because prejudgment interest is an item of damages (*North Oakland Medical Clinic v. Rogers*, *supra*, 65 Cal.App.4th at p. 830), the interest to be awarded Rick Concrete pursuant to this opinion increases its overall damages award, which, in turn, may require re-calculation of Rick Concrete's costs as well, given the impact of section 998, subdivision (c)(1) of the Code of Civil Procedure on the trial court's initial costs order. It is therefore necessary that we vacate the trial court's order taxing costs and remand to the trial court for reconsideration of the awardable costs.

## II

*WAUSAU'S CROSS-APPEAL*

A. *Substantial Evidence Supports the Trial Court's Determination of Coverage*

### 1. Standard of Review

In its cross-appeal, Wausau challenges the trial court's ruling in the declaratory relief action that the February 2006 accident fell within the coverage provisions of Rick Concrete's insurance policy. Specifically, Wausau contends the trial court erroneously found that the Putzmeister vehicle was a covered "auto," and that the accident did not fall within the "operations" exclusion of the policy.

The parties disagree as to the appropriate standard of review governing our resolution of these issues. Wausau contends that the trial court's determination of coverage must be reviewed de novo. Wausau is correct that the interpretation of an insurance policy, as with other contracts, is generally considered a question of law and is reviewed independently, at least where the extrinsic evidence admitted to aid in interpretation is not conflicting. (See *Waller v. Truck Ins. Exchange* (1995) 11 Cal.4th 1, 18; *Prudential Ins. Co. of America v. Superior Court* (2002) 98 Cal.App.4th 585, 595 [review is independent "unless [the trial court's] 'interpretation turned upon the credibility of conflicting extrinsic evidence' "].) On the other hand, if the determination of coverage requires the trial court to evaluate conflicting evidence, or resolve conflicting inferences arising from the evidence, its resulting factual findings are reviewed for substantial

evidence. (*Alpine Ins. Co. v. Planchon* (1999) 72 Cal.App.4th 1316, 1323, 1324 (*Alpine Ins. Co.*).)

In *Alpine Ins. Co.*, the trial court, as here, was required to determine whether the subject vehicle was an "auto" or " ' "mobile equipment." ' " (*Alpine Ins. Co.*, *supra*, 72 Cal.App.4th at p. 1320.) As Wausau does here, Alpine argued that the trial court's interpretation was subject to independent review. (*Ibid.*) The appellate court disagreed. "The critical inquiry here," that court reasoned, "was not the interpretation of Alpine's policy but the application of it," and that application "had to await the determination of whether defendants' pickup was an auto or mobile equipment." (*Id.* at p. 1324.) Making that determination would "depend upon several subsidiary determinations, including the primary purpose or purposes for which the pickup was maintained," which, in turn, would require evaluation of the witnesses' testimony. (*Ibid.*) "Even if that testimony was largely or completely uncontradicted, substantial evidence review is still required because the evidence could support opposing inferences." (*Ibid.*, citing *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632-634.)

As often occurs, Wausau's cross-appeal presents issues arguably subject to review under both the de novo and substantial evidence standards. To a certain extent, the trial court was obligated to construe the scope of the coverage and exclusion language of the policy. Yet, the trial court's determination of coverage in this case also rested upon its explicit findings of fact as to whether the Putzmeister vehicle was an "auto" and whether the "operations" exclusion applied to the accident in question. Those factual findings, in

turn, rested upon the trial court's resolution of conflicting inferences arising from the conflicting (if uncontradicted) evidence—a process the trial court considered to be a "tough call."

In our view, the trial court's determination of coverage was less an exercise of contract interpretation and more of a "particularized factual inquiry" of the type at issue in *Alpine Ins. Co.* (*Alpine Ins. Co.*, *supra*, 72 Cal.App.4th at p. 1323.) In the end, however, review under either the de novo or substantial evidence standard leads to the same result, as we conclude there was no error either in the interpretation or application of the provisions in question.

To the extent we are required to review the trial court's construction of the Wausau policy's language, we do so independently, discerning the parties' intent from the plain meaning of the words used, if possible, and reading that language in the context of the policy as a whole. (*Davis v. Farmers Ins. Group* (2005) 134 Cal.App.4th 100, 104 (*Davis*).) If the provision under review is capable of two or more reasonable interpretations, it is ambiguous, and that ambiguity must be resolved "in the insureds' favor, consistent with the insureds' reasonable expectations." (*Ibid.*) To the extent we review the trial court's factual findings, we apply the substantial evidence standard. This standard requires us to view the evidence in the light most favorable to the prevailing party, and to affirm if there is sufficient evidence to support the trial court's judgment, no matter how slight it might be, and even though there may be evidence that would have supported different inferences or a different outcome. (See, e.g., *Bowers*, *supra*, 150

41

Cal.App.3d at p. 874.) " 'When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.' [Citation.]" (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.)

### 2. The Finding that the Putzmeister Vehicle Was an "Auto"

Rick Concrete's business auto policy provides that Wausau will pay all sums its insured must pay "because of 'bodily injury' or 'property damage'. . . caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.' " Section V, paragraph B of the policy defines "[a]uto" as "a land motor vehicle, 'trailer' or semitrailer designed for travel on public roads but does not include 'mobile equipment.' " Section V, paragraph K then lists various types of vehicles that constitute "[m]obile equipment," including [¶] 4. "Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted: [¶] a. Power cranes. . .," and [¶] 5. "Vehicles . . . that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types: [¶] a. . . pumps . . ." However, the policy further specifies: [¶] 6. " . . . [S]*elf-propelled vehicles* with the following types of permanently attached equipment *are not 'mobile equipment' but will be considered 'autos'*: . . . [¶] b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and [¶] c. . . . *pumps . . .*"

Under the terms of the policy, then, coverage depends initially on whether the Putzmeister concrete pumper truck was an "auto" and not "mobile equipment," and even

42

if it might arguably be considered the latter, whether it falls within one of the exceptions noted above for self-propelled vehicles with permanently attached equipment. Wausau contends that the equipment involved in the accident at issue here was not an "auto," but critically, its argument focuses solely on the "concrete boom pump" portion of the vehicle—not on the vehicle as a whole. Rick Concrete, on the other hand, presented evidence demonstrating that the Putzmeister concrete pumper truck is a single, integrated, articulated vehicle consisting of a tractor and trailer that are meant only to be driven, parked and operated together.

Thus, the evidence showed that the concrete pumper truck is self-propelled and designed to travel frequently over the public roads and highways. It bears many of the common features of an automobile, including a horn, seat belt, brake lights, windshield, odometer, speedometer, and side view mirrors. The vehicle is able to reach highway speeds and is not intended for off-road use. Importantly, the trailer portion of the vehicle is not meant to be operated independently of the tractor. The tractor serves as the source of electrical and hydraulic power and fuel for the trailer. The tractor has a wider wheel base and acts as a ballast or counterweight for the trailer when the boom is deployed and the trailer is in pumping mode.

Importantly, the tractor and trailer were engineered together to ensure that the tractor provides the necessary counterweight for the trailer. Witnesses testified that although it may be physically possible to disconnect the tractor from the trailer, they are not meant to operate independently or to come apart. Gary Schmidt, the regional sales

43

manager for Putzmeister, and Robert Weatherton, a member of the board of the American Concrete Pumping Association, both testified that they have not seen the tractor operated, driven or parked independently of the trailer, or even disconnected from one another. Weatherton testified that the only reason he could suppose the tractor and trailer would be disconnected is if either were "wrecked." Schmidt explained that the tractor and trailer are leased only as a single unit.

The trial court ultimately found that the "Putzmeister 52 meter unit is a single, self-propelled unit," and thus is a covered "auto" within the meaning of section V, paragraph K, subparagraph 6.c. of Wausau's policy. It detailed in its decision that "the tractor and the trailer are one unit," are "never disconnected," and are "engineered . . . to act as one unit." The foregoing substantial, uncontradicted evidence supports these findings.

Wausau disregards the evidence summarized above, and instead appears to argue that the Putzmeister vehicle falls under the category of "mobile equipment" defined in section V, subparagraph 5.a. of the policy: vehicles that "are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment" including "pumps." Thus, Wausau emphasizes that the concrete boom pump itself is not "self-propelled," and that the tractor and trailer bear separate license plates, and physically may be separated. As noted, however, the evidence relied on by the trial court indicated that the tractor part of the vehicle and the trailer part, including the "concrete boom pump," properly should not be considered separately, but as one vehicle. Furthermore, Wausau's

44

evidence does not contradict the facts cited by the trial court, nor does it inevitably lead to the conclusion that the vehicle is "mobile equipment" of the type not covered under the policy. As the trial court observed, Wausau's policy itself contemplates that "mobile equipment" under certain circumstances may be considered an "auto." Referring to the definitions set forth in section V, paragraph K, subparagraphs 6.b. and 6.c. of Wausau's policy, trial court noted that the vehicle is an auto "even though it might otherwise be defined as mobile equipment, *so the policy itself considers this mobile equipment as a covered auto*." Whether or not Wausau's evidence might have supported a different inference, our task "begins and ends with the determination as to whether . . . there is substantial evidence, contradicted or uncontradicted, which will support the [trial court's] determination, and when two or more inferences can reasonably be deduced from the facts, [we are] without power to substitute [our] deductions for those of the trial court." (*Bowers*, *supra*, 150 Cal.App.3d at pp. 873-874, italics added.) Because substantial evidence supports the trial court's finding that the equipment at issue is an "auto" covered under Wausau's policy, we affirm that ruling.

### 3. The Finding that the "Operations" Exclusion Did Not Apply

Wausau's "operations" exclusion provides that insurance coverage is unavailable for " '[b]odily injury' or 'property damage' *arising out of the operation of* any equipment listed in [section V, paragraph K, subparagraphs] 6.b and 6.c. of the definition of 'mobile equipment.' " The definition of "mobile equipment" under subparagraph 6.c. of the

45

policy, as noted previously, includes "pumps." The trial court found that the accident occurred "when the unit tipped over" at a time the pump was not pumping concrete. Thus, the trial court concluded, the accident did not arise out of operation of the equipment, but rather, "arose out of parking the unit and the cause of the action was the shifting of center of gravity when the boom changed [position]."[11]

Wausau contends that the trial court erred in finding the "operations" exclusion did not apply because, according to Wausau, the accident "undeniably 'arose out of' the 'operation' of the concrete pumping equipment." The "prelude to the accident," Wausau argues, was the "operation of the pump, the presence of Mr. Guillen laying concrete, and the boom hovering over head." As such, this was not a "transportation" accident but a "a construction accident" that occurred "during construction operations," and thus was properly covered by Lexington's CGL policy, not by Wausau's business auto policy. The trial court erred, Wausau maintains, when it read the exclusion language too narrowly, and "lost sight of the relationship between the auto and CGL policies." We disagree.

It is undisputed that at the time of the accident, the Putzmeister vehicle was stationary, with its outriggers deployed and the boom extended. It is also undisputed that the concrete pumping equipment was not operating, meaning that it was not pumping concrete.[12] Terry Saville, a safety engineer with California's Office of Safety and Health Administration (CalOSHA), testified that "[t]he pump did not cause the accident."

---

11    The "operations" exclusion comes into play only with respect to the third party damages liability claims that were at issue at the trial of Wausau's claims for declaratory relief.

Rather, Saville testified, the accident occurred when the concrete pumping boom was being further extended, shifting the vehicle's center of gravity. Because of the way the vehicle had been parked and where the outriggers had been deployed, the ground underneath the fourth outrigger gave way, causing the boom to collapse. Hanneman testified that her investigation pointed to the same conclusion. Wausau presented no contradictory evidence, and indeed, concurs that these facts describe the circumstances of the accident.

Based on this evidence, the trial court concluded that the accident "arose out of parking the unit and the cause of the accident was the shifting of center of gravity when the boom changed . . . and the unit toppled over." The foregoing substantial evidence supports this finding, and Wausau does not really argue otherwise. Rather, the underlying premise of Wausau challenge is that these facts, even if true, do not constitute the type of risk its business auto policy was intended to cover. At the time of the accident, Wausau contends, the equipment was in construction mode, not transportation mode, but its policy covers only transportation risks. Wausau further argues that the trial court essentially concluded the exclusion would have applied in this case only if Guillen's death had been caused directly by the operation of pumping concrete. This interprets the

---

12    At one point in its brief, Wausau asserts that at the time of the accident, "the concrete placing boom pump was operating and placing concrete," At trial, however, it conceded the equipment was not pumping concrete at the time, and the testimony supported that fact. We therefore will disregard Wausau's contrary statements in its brief. (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752 [counsel's statement in open court on a disputed issue was a binding judicial admission].)

47

exclusion far too narrowly, Wausau maintains for the exclusion in fact applies whenever there is the slightest connection between the excluded activity and the injury. Wausau further argues such a connection exists in this case because the accident occurred when the boom was being used for construction purposes. Specifically, it was being relocated for the purpose of pumping concrete onto a different part of the foundation under construction.

We begin this part of our analysis with a fundamental principle of insurance policy interpretation—one that Wausau does not acknowledge: "Whereas coverage clauses are interpreted broadly as to afford the greatest possible protection to the insured [citations], exclusionary clauses are interpreted narrowly against the insurer." (*State Farm Mut. Automobile Ins. Co. v. Partridge* (1973) 10 Cal.3d 94, 101-102 (*State Farm*); see also *Davis*, *supra*, 134 Cal.App.4th at p. 107 ["we strictly construe policy exclusions against the insurer"]; *Marquez Knolls Property Owners Assn.*, *Inc*. *v*. *Executive Risk Indemnity, Inc*. (2007) 153 Cal.App.4th 228, 233-234 (*Marquez Knolls*) ["While coverage clauses are interpreted broadly, exclusionary clauses are construed against the insurer."].) Wausau focuses on the phrase "arising out of" and argues that California courts are required to interpret this language expansively. (See, e.g., *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 328 (*Syufy*) [this language "connotes only a minimal causal connection or incidental relationship"].) Critically, however, this is only true when this phrase appears in a coverage or insuring clause. "[W]hen the phrase "arising out of" is used in an *exclusion*, rather than a coverage provision, it is interpreted

*narrowly against the insurer.*"  (Croskey et al., Cal. Practice Guide (The Rutter Group 2010) Insurance Litigation, ¶ 4.120.5, at 4-23 [italics in original], citing *State Farm*, *supra*, 10 Cal.3d at pp. 101-102 ["an entirely different rule of construction applies to exclusionary clauses as distinguished from coverage clauses"].)[13]

With these principles in mind, we interpret the terms "arising out of" and "operation" giving them " 'the "objectively reasonable" meaning a lay person would ascribe to them,' " but also recognizing that the context in which they appear is critical. (*Marquez Knolls*, *supra*, 153 Cal.App.4th at p. 234.)  As Wausau emphasizes, its policy is intended to cover transportation-related risks, not construction accidents.  The difficulty is in identifying the line where the coverage under Wausau's auto policy ends and coverage under Lexington's CGL policy begins.  In our view, the language of the "operations" exclusion is sufficiently narrowly tailored to assist in identifying that line. First, we observe that the exclusion applies only to the operation of certain types of equipment, specifically, those listed in section V, paragraph K, subparagraphs 6.b and

---

[13]    We do not believe the authorities cited by Wausau require a different interpretative approach.  In *Syufy*, for instance, the court was required to construe "arising out of" in the context of an additional coverage endorsement.  (*Syufy*, *supra*, 69 Cal.App.4th at p. 324.) *Century Transit Systems v. American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121, involved facts starkly different from those presented here, as the insured in that case did not dispute that the claim was " 'based on assault and battery' " (i.e., that its employee beat two men) and thus the plain meaning of that exclusionary language controlled.  (*Id.* at pp. 124, 127, italics omitted.)  *Continental Casualty v. City of Richmond* (9th Cir. 1985) 763 F.2d 1076, while purporting to interpret California law, broadly construed "arising out of" language in an exclusion clause, but cited in support only cases interpreting that language in coverage clauses.  (See *id.* at p. 1080, citing *Pacific Indemnity Co. v. Truck Ins. Exchange* (1969) 270 Cal.App.2d 700, and *Hartford Accident & Indemnity Co. v. Civil Service Employees Ins. Co.* (1973) 33 Cal.App.3d 26.) We therefore do not find these cases to be particularly apposite.

6.c., of the "Definitions" provisions of the policy. Of those types of equipment, including cherry pickers, air compressors, pumps and generators, only "pumps" applies here. The trial court so found and Wausau does not challenge that determination.

Accordingly, the exclusion applies only if the Rick Concrete's liability for damages arose out of the operation of the concrete pump. As noted, however, the concrete pump was not operating at the time of the accident. In the most basic sense, then, the accident did not "arise out of" the "operation" of the pump. Wausau urges us to take into account the overall setting of the accident, including the fact that the boom through which the concrete was pumped was being repositioned at the time. In a broad sense, the positioning of the boom might be deemed part of the overall "operation" of the Putzmeister equipment. However, the exclusion, by its express terms, requires us to consider not the operation of *any* part of the covered "auto," but only the operation of the relevant equipment listed in subparagraph 6.c.—i.e, the pump. Consequently, the trial court did not err in focusing on whether the pump itself was operating at the time of the accident.

Contrary to Wausau's contention, we view this construction of the exclusion to be entirely consistent with the respective purpose and intent underlying the Wausau and Lexington policies. Transportation risks covered under Wausau's policy (that is, damage or injury "caused by an 'accident' and resulting from the ownership, maintenance or *use* of a covered 'auto' "), include those associated with parking a vehicle, at least when the parking of the vehicle plays a substantial role in the injury or damage at issue. (See, e.g.,

50

*American Nat'l Property & Casualty Co. v. Julie R*. (1999) 76 Cal.App.4th 134, 140-141 [parking vehicle along a chain link fence is a "use" of a vehicle, but court affirmed ruling of no coverage because where the vehicle was parked was merely incidental to the injury—a rape—that occurred in the car]; *Nat'l American Insurance Co. v. Coburn* (1989) 209 Cal.App.3d 914, 920 [exclusion in *homeowner's* policy for damage or injury "arising out of" use of a vehicle included parking and braking of a vehicle].)  In *Utah Home Fire Ins. Co. v. Fireman's Fund Ins. Co.* (1970) 14 Cal.App.3d 50, the court found coverage under an auto policy where a driver had parked his car and then called his friend over to speak with him.  While the friend was leaning on the car and speaking to the driver, he was injured by a passing car.  (*Id*. at pp. 51-52.)  Wausau acknowledges that in that case, "[p]arking the car near traffic was the essential factor that placed the parties in their respective positions (and in danger of being hit by passing vehicles) at the time of the accident."  In other words, where the car was parked was an essential factor leading to the accident.

The same is true here.  The undisputed evidence is that the Putzmeister vehicle was parked in an area that necessitated deploying at least one outrigger on compacted soil rather than asphalt.  Further, the evidence indicates the accident directly arose from the act of parking the vehicle in this manner.  As noted, Wausau does not dispute that this.  Indeed, CalOSHA's safety engineer testified that if the fourth outrigger had been deployed on asphalt instead of on unstable soil, the accident probably would not have occurred.  The phrase "arising out of" has frequently been interpreted as referring "to

51

origin, such as whether something grows out of or flows from an event." (*Harris v. Lammers* (2000) 84 Cal.App.4th 1072, 1076.) The evidence in this case supports the trial court's finding that the accident at issue here "flowed" directly from, and thus "arose out of," the manner in which the covered 'auto' had been parked, not the operation of the concrete pump.

B. *The Trial Court's Denial of Wausau's Request for Reimbursement of Expert Witness Fees was Within its Discretion*[14]

After trial, the court designated Rick Concrete as the prevailing party, and determined that its allowable costs amounted to $31,262.86. Prior to the originally scheduled trial date, however, Wausau made a $40,000 settlement offer to Rick Concrete pursuant to Code of Civil Procedure section 998. The value of the final judgment fell just short of Wausau's offer. Nevertheless, that result entitled Wausau to recover its postoffer costs if the trial court found the settlement offer was reasonable, which it did. (Code Civ. Proc., § 998, subd. (c)(1).) Pursuant to section 998, subdivision (c)(1), the trial court awarded Wausau $15,407.39 in postoffer costs, bringing Rick Concrete's net preoffer costs recovery to $15,855.47. This award of costs did not include over $42,000 Wausau incurred to retain and prepare experts who never testified at trial. The trial court denied

_____

14    Wausau's challenge to the ruling denying reimbursement of its expert witness fees under section 998 of the Code of Civil Procedure may ultimately prove to be moot. Given our holding on Rick Concrete's entitlement to prejudgment interest (at p. 38, *ante*) on remand the trial court may determine that Rick Concrete's damages exceed Wausau's section 998 offer of settlement, in which case Wausau would not be entitled to any costs, including expert witness fees, under subdivision (c) (1) of that statute. However, because it may be helpful to the trial court on remand of the costs order, we will address and resolve here Wausau's contentions regarding its request for reimbursement of expert witness fees.

Wausau's request for reimbursement of those costs, concluding that Wausau had failed to provide it with "evidence to substantiate the work performed," as a result of which the trial court could not determine whether the fees incurred were " 'reasonably necessary' " as required by the statute.

Wausau appeals this ruling. We review the trial court's denial of expert witness fees under section 998 for abuse of discretion because, contrary to Wausau's assertion, at issue here is an exercise of the trial court's discretionary power, not statutory interpretation. (See, e.g., *Adams v. Ford Motor Co*. (2011) 199 Cal.App.4th 1475, 1484 ["the decision to award expert witness fees [under section 998], and the determination of whether these fees were reasonably necessary, are issues left to the discretion of the trial court"]; *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 121 (*Santantonio*) [trial court's determination of section 998 costs issues can be reversed only for abuse of discretion].) The burden is on the appellant to establish an abuse of discretion, and "unless a clear case of abuse is shown along with a miscarriage of justice, a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." (*Najera v. Huerta* (2011) 191 Cal.App.4th 872, 877; see also *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 136.)

Section 998 of the Code of Civil Procedure expressly permits the trial court, in its discretion, to require a plaintiff "to pay a reasonable sum to cover costs of the services of expert witnesses, . . . actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the

53

defendant." (Code Civ. Proc., § 998, subd. (c)(1).) A "verified memorandum of costs is prima facie evidence of [the] propriety" of the items listed on it, and the burden then shifts to the party challenging those costs to show that they were not reasonably necessary. (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1266 (*Jones*).) " 'On the other hand, if items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs.' [Citation.]" (*Ibid.*)

Wausau's complaint on appeal is that Rick Concrete never properly objected to the expert witness fees by challenging them on the ground ultimately ruled on by the court. Rather, Wausau contends, Rick Concrete objected to Wausau's recovery of the fees because the experts never testified at trial, and because it could not be determined whether the costs were incurred only during the postoffer period. Wausau is correct that recovery of expert witness fees does not depend on whether the experts testified at trial. (See, e.g., *Santantonio*, *supra*, 25 Cal.App.4th at pp. 123-124 [§ 998 expressly allows recovery of expert costs that were reasonably necessary in either, or both, preparation for trial or trial].) It is also true that the statute does not limit recovery to fees incurred during only the postoffer period. (*Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 532-533.)

In our view, however, these arguments miss the mark. In the final analysis, "whether a cost item was reasonably necessary is still a question of fact to be decided by the trial court." (*Jones*, *supra*, 63 Cal.App.4th at p. 1266; see also *Ladas v. California State Automobile Ass'n* (1993) 19 Cal.App.4th 761, 774.) The trial court emphasized this

54

point repeatedly during the hearing on section 998 costs, when it remarked that "if the predicate is not met, in other words, if the court isn't given information that the expert . . . fee was reasonable and was reasonably necessary for the conduct of the litigation," it could exercise its discretion to disallow all or part of that fee.  Wausau acknowledges that, as the court found, it provided only the names, the number of hours worked and the hourly rate for each of the experts.   As a result, the court concluded, it had "no basis from which to find that the work performed was reasonably necessary to the conduct of the litigation or that the fees are reasonable amounts."  (Compare *Michelson v. Camp* (1999) 72 Cal.App.4th 955, 976 [expert witness fees properly allowed where party seeking fees provided not only an explanation of the expert's hourly rate but also of "what he had done"]; see also *Acosta v. SI Corp.* (2005) 129 Cal.App.4th 1370, 1380 [respondent provided adequate support in its memorandum of costs which included detailed invoices, reports, receipts and other documentation].)

Although Rick Concrete's briefs on the costs motion were sparse on the subject of why expert fees should not be allowed, they did raise concerns based on the lack of supporting evidence, even if the legal grounds for those concerns were flawed. Moreover, Rick Concrete squarely raised the lack of documentation supporting Wausau's claimed expert witness fees at the hearing on costs.  Wausau provided oral argument as to why the fees incurred were reasonably necessary, but at no time did it offer to supplement its submissions with substantiating evidence to address Rick Concrete's argument (and in the end, the court's concerns).

55

Wausau argues, in effect, that all Code of Civil Procedure section 998 expert witness fees must be allowed when the opponent has not raised every possible objection to those fees, even though the propriety of the fees has been placed in issue, and even though the trial court, in the exercise of its duty, independently concludes there is insufficient evidence to establish the statutory predicate of reasonable necessity. This argument is not consistent with the statutory grant of authority to allow recovery of expert witness fees. Only costs that are "reasonably necessary" in preparation for, or during the trial, may be allowed. (Code Civ. Proc. § 998, subd. (c)(1).) If the record on its face fails to support such a finding, we do not believe the trial court is nevertheless *required* to allow such fees merely because of the inexact manner in which the opposing party objected to them.

We conclude that once Rick Concrete placed the propriety of the expert witness fees in issue, the burden shifted back to Wausau to demonstrate that the claimed fees were reasonably necessary to the conduct of the litigation. They did not satisfy their burden, although they had the opportunity to do so once that specific issue was directly raised. Under all the circumstances, the trial court's decision to disallow these costs was within its discretion, and did not result in a "manifest miscarriage of justice." (*Culbertson v. R. D. Werner Co., Inc*. (1987) 190 Cal.App.3d 704, 710 [Such a discretionary ruling will not be disturbed on appeal absent a showing that discretion was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.].)

56

## DISPOSITION

The trial court's denial of prejudgment interest on the $23,419 first party payment is reversed.  Rick Concrete is awarded the sum $1,123.50 in prejudgment interest.  In view of the interest award, the trial court's order taxing costs is vacated, and this matter is remanded for further proceedings consistent with this opinion.  In all other respects the trial court's judgment and posttrial orders are affirmed.

The parties shall bear their own costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


HALLER, J.

57